IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PETER G., by and through his Parents, | : | |
| SUSAN T. and RONALD G., and | : | |
| SUSAN T. and RONALD G., individually, | : | |
| of Hershey, Pa., 17033 | : | |
| | : | Civil Action |
| Plaintiffs | : | |
| v. | : | No. |
| | : | |
| DERRY TOWNSHIP SCHOOL | | |
| DISTRICT | : | |
| 30 East Granada Ave, | : | |
| Hershey, Pa., 17033 | : | |
| | : | |
| Defendant. | : | |

**COMPLAINT**

## I.     Introduction

1.      This action is brought by Peter G. ("Peter"), a minor child with disabilities, by and through his parents, Susan T. and Ronald G., and Susan T. and Ronald G., individually, ("Parents," and together with Peter, the "Plaintiffs" or the "Family"), against Defendant Derry Township School District (the "District") because, in the words of a 30-year, veteran school psychologist, Peter was "just unraveling" at school while the District steadfastly refused to provide the special education support he needed, even after Peter was the victim of bullying and harassment including threats of physical violence from his peers.

2.      Peter is a 15-year-old with disabilities including Attention Deficit Hyperactivity Disorder ("ADHD"), Specific Learning Disabilities, Epilepsy, Incomplete Hippocampal Inversion (an atypical anatomical pattern of the hippocampus, or the memory center of the brain), and accommodative vision spasms.

3.      He attended the Derry Township School District (the "District") for most of

elementary school and middle school.

4.      The Family's claims are brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, and its federal and state implementing regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and its federal and state implementing regulations; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and its federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

5.      After fully and independently considering the entire record and the failures of the District to provide Peter with a Free Appropriate Public Education ("FAPE"), this Court should determine that the District violated the foregoing statutes and reverse the Hearing Officer's decision. Specifically, this Court should (1) reverse the Hearing Officer's determination that Parents' claims before January 10, 2020 are barred by the statute of limitations and hear limited evidence relating to the District's denial of FAPE for the erroneously barred school years pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii); (2) award compensatory education based on the District's failures to offer and provide a FAPE to Peter from January 2020 to May 2021; (3) award reasonable attorneys' fees and costs; and (4) award any other relief this Court deems just.

## II.     Parties

6.      Peter was born in 2007, and, at all times relevant to this action, resided within the geographical boundaries of the District. Peter is a student with disabilities as defined under IDEA and a Protected Handicapped Student under Section 504 and the ADA.

7.       Susan T. and Ronald G. are Peter's parents. At all times relevant to this action, Parents resided within the geographical boundaries of the District.

8.      The District is located at 30 East Granada Ave, Hershey, Pennsylvania. The District

is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries; such services include those mandated under IDEA, Section 504 and the ADA. *See* 22 Pa. Code Chapters 14 and 15; *see also* 24 P.S. Chapter 13.

III.   **Procedural History**

9.     On January 10, 2022, Parents filed a Special Education Due Process Complaint.

10.    On January 20, 2022, the District filed its Answer and raised the issue of the timeliness of Parents' claims.

11.    On February 9, 2022, the parties submitted offers of proof relating to the date on which the Parents Knew or Should Have Known ("KOSHK") of the District's violations, triggering the statute of limitations.

12.    On February 22, 2022, Administrative Hearing Officer Joy Waters Fleming, Esquire ("Hearing Officer Fleming") held an evidentiary hearing relating to the statute of limitations issue, at which both parties presented witnesses and documentary evidence on a live, videoconferencing platform.

13.    At the February 22, 2022 hearing, Hearing Officer Fleming advised that she may first issue an order to decide the statute of limitations issue and then follow the order with detailed reasons for her determination in the final decision.

14.    On March 11, 2022, the parties submitted written arguments relating to the statute of limitations issue.

15.    On March 21, 2022, the Hearing Officer issued an Order limiting Parents' claims to those occurring after January 10, 2020.

16.     There were no findings of fact or detailed reasons included in the March 21, 2022, order and no findings or reasons were ever provided by Hearing Officer Fleming.

17.     The Hearing Officer convened the due process hearing related to the school years after January 10, 2020 over several dates in April, May, June, and July 2022, at which both parties presented witnesses and documentary evidence on a live, videoconferencing platform.

18.     On October 12, 2022, Hearing Officer Fleming issued her final decision denying the Family's claims.

19.     Parents bring this action to appeal the Hearing Officer's decision with respect to the incorrect application of the statute of limitations and the Hearing Officer's erroneous denial of compensatory education to the Family.

## IV.    **Jurisdiction and Venue**

20.     This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA, Section 504, and the ADA.

21.     Plaintiffs have exhausted their administrative remedies where required under 20 U.S.C. § 1415(i), having timely pursued an administrative Special Education Due Process hearing. *See* 20 U.S.C. § 1415(i)(2)(A).

22.     The Family's claims and remedies are authorized by 20 U.S.C. § 1415; 29 U.S.C. § 794(a); and 28 U.S.C. §§ 2201 and 2202. These statutes provide for declaratory and equitable relief and any further relief that this Court deems necessary and proper.

23.     All of the Defendant's actions have taken place within the jurisdiction of the United States District Court for the Middle District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

## V.     **Standard of Review**

24.     This Court is required to undertake a fully independent review of the records and the Hearing Officer's decision. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07, 102 S. Ct. 3034, 3051 (1982). This review is far broader and more searching than a district court's review of other administrative matters. Judicial review in IDEA cases is called "modified de novo" review because it "differs substantively from judicial review in other agency actions, in which the courts are generally confined to the administrative record and are held to a highly deferential standard of review." *Susan N. v. Wilson School District*, 70 F.3d 751, 757 (3d Cir. 1995).

25.     In conducting this independent review, district courts: (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. 20 U.S.C. § 1415(i)(2)(B).

26.     In conducting a modified de novo review, district courts give "due weight" to the factual findings of the administrative agency. *S.H. v. School District of Newark*, 336 F.3d 260, 269 (3d Cir. 2003). "Due weight" means that although the district courts must consider the administrative fact findings, the courts are free to reject such findings. *Id*. at 269-70. Thus, when reviewing an administrative proceeding in an IDEA case, the district court should "defer to the hearing officer's factual findings," unless it can point to contrary non-testimonial extrinsic evidence in the record. *Carlisle Area School District v. Scott P*., 62 F.3d 520, 529 (3d Cir. 1995). If the Court does not accept these factual findings, it needs to explain why. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004).

27.     The modified de novo review under the IDEA does not apply to Section 504 and ADA claims. *K.N. v. Glouster City Bd. Of Edu.*, 379 F. Supp. 3d 334, 344 (D.N.J. 2019). Thus, a federal district court applies a de novo standard of review for the Section 504 and ADA claims, as

opposed to the modified de novo standard of review that the Court will apply for the IDEA claims. *Id.* (*citing T.F. v. Fox Chapel Area Sch. Dist.*, 589 F.App'x 594, 598 (3d Cir. 2014)).

## VI.   Applicable Law

### A.   IDEA and Section 504 require that a school district identify and evaluate all children with disabilities who live in the district in all areas of suspected need.

28.     The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

29.     The Supreme Court has stated that IDEA, a statute designed to protect children with disabilities, has a "general remedial purpose." *Forest Grove v. T.A.*, 557 U.S. 230, 244, 129 S. Ct. 2484 (2009). It is a "canon of construction that remedial statutes should be liberally construed." *Peyton v. Rowe*, 391 U.S. 54, 65, 88 S. Ct. 1549 (1968).

30.     Under Section 504, recipients of federal funds are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

31.     Section 504 defines "appropriate education" as "the provision of regular or special education and related aids and services that (i) are designed to meet individual educational needs of the handicapped persons as adequately as the needs of non-handicapped persons are met and (ii) are based on adherence to the procedures that satisfy the requirements of Section 104.34, 104.35, and 104.36." 34 C.F.R. § 104.33(b).

32.     The requirement that school districts properly identify all eligible children is known as Child Find and is mandated under both IDEA and Section 504. 20 U.S.C § 1412(a)(3)(A) and (B); 29 U.S.C.§ 794; 34 C.F.R. §§ 104.33, 300.111. Under these statutes and their regulations,

school districts have a continuing obligation to properly evaluate and accurately identify all students who are reasonably suspected of having a disability. *Ridley Sch. Dist. v. M.R.*, 680 F.3d. 260 (3d Cir. 2012).

33.     The failure to timely evaluate a child once the school district knows of behaviors that could indicate a disability is known as a child find violation. *W.B.*, 67 F.3d at 501; *see also Ridley School Dist.*, 680 F.3d at 271.

34.     Under IDEA, the public agency must ensure that a student's "evaluation is sufficiently comprehensive to identify all of the child's special education and related services needs, whether or not commonly linked to the disability category in which the child has been classified." 34 C.F.R. § 300.304.

35.     "[A] poorly designed and ineffective round of testing does not satisfy a school's Child Find obligation." *D.K. v. Abington Sch Dist.*, 696 F.3d at 250 (*citing G.D. ex rel. G.D. v. Wissahickon Sch. Dist.*, 832 F. Supp. 2d 455, 465-67 (E.D. Pa. 2011) (finding the school's reevaluation of an elementary student with significant behavioral problems was inadequate because it overemphasized academic proficiency and assessed behavioral issues only cursorily).

**B.    Pursuant to IDEA, after the school district identifies a student's needs in an Evaluation Report, the IEP Team must use the report to create an IEP and offer a student a Free Appropriate Public Education.**

36.     The IDEA provides that an IEP team, which includes both school officials and the child's parents, must develop an appropriate educational program and placement for each eligible child through an IEP. A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the district complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit. *Rowley*, *supra*, 458 U.S. at 206-07,

102 S. Ct. at 3051; *Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999 (2017).

37.     The United States Supreme Court in its decision in *Endrew F.*, *supra*, emphasized that IDEA requires *more* than a program reasonably calculated to allow a student to make "*some* progress." *Endrew F.*, 137 S. Ct. at 997, 1000-01 (emphasis added). Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

38.     The progress standard set forth in *Endrew F.* is therefore consistent with, and expands upon, the standard that has been applied for many years in this Circuit, requiring that a student must receive a program that is reasonably calculated to allow a student to make *meaningful* educational progress and achieve "significant learning." *Brandywine Heights Area School Dist. v. B.M.*, 248 F. Supp. 3d 618, 632 (E.D. Pa. 2017) (*citing Endrew F.*); *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 390 (3d Cir. 2006)).

39.     It is well-settled that "education" extends beyond discrete academic skill, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School Dist.*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

**C.      School districts are required to conduct evaluations and periodic reevaluations of students believed to need special education or related services.**

40.     Similarly, Section 504 requires that school districts evaluate "any person who, because of handicap, needs or is believed to need special education or related services before taking any action with respect to the initial placement of the person in regular or special education and any subsequent significant change in placement." 34 C.F.R. § 104.35(a).

41.     School districts are required to establish standards or procedures for Section 504 evaluations which ensure that tests and other evaluation materials and tests have been validated, administered by trained personnel in conformance with the instructions, tailored to assess specific areas of educational need and not merely a single general intelligence quotient, and selected and administered so as best to ensure that test results accurately reflect the student's aptitude or achievement level, rather than reflecting the student's impaired sensory, manual, or speaking. 34 C.F.R. § 104.35(b). Moreover, in interpreting evaluation data and in making placement decisions, a school district must, *inter alia*, draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommendations, physical condition, social or cultural background, and adaptive behavior; ensure that information obtained from all such sources is documented and carefully considered; ensure that the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and conduct periodic reevaluations of the student. 34 C.F.R. § 104.35(b)-(c).

**D.     Pennsylvania requires written and executed 504 Service Agreements to outline the aids, services, or accommodations for a student.**

42.     Pennsylvania requires that a 504 Service Agreement be "written and executed by a representative of the school district and one or both parents." 22 Pa. Code § 15.7.

43.     Additionally, the agreement must "set forth the specific related aids, services or accommodations the student shall receive, or if an agreement is being modified, the modified services the student shall receive." 22 Pa. Code § 15.7.

**E.     Under both IDEA and Section 504, compensatory education is an available remedy for a District's denial of FAPE to a student.**

44.     When a District fails to provide FAPE under both the IDEA and Section 504, it is well-settled that compensatory education is an available remedy. *Lester H. v. Gilhool*, 916 F.2d

865 (3d Cir. 1990); *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 250 n.11 (3d Cir. 1999); *M.C.*, *supra*, 81 F.3d at 397.

45.     Compensatory education is designed to provide eligible students with the services they should have received pursuant to a FAPE. *Lester H.*, *supra*, 916 F.2d at 873.

46.     Where a school district's failures deprive the student of the opportunity to benefit from an IEP, then the child find violation results in a substantive violation of IDEA and entitles the student to compensatory education. *Jana K. v. Annville-Cleona Sch. Dist.*, 39 F.Supp.3d 584, 603 (M.D. Pa. 2014).

47.     The amount of compensatory education is calculated by finding the period of deprivation of special education services and excluding the time reasonably required for the school district to rectify the problem. *M.C.*, 81 F.3d at 397. Thus, compensatory education is an in-kind remedy intended to provide educational services denied to a child by a school district's failure to provide a FAPE. *Lester H.*, 916 F.2d at 873.

**F.     Violations of IDEA also violate Section 504, but a school may violate Section 504 independent of any IDEA violations.**

48.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA.  However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

49.      A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA). The eligibility standards under Section 504 for children

with disabilities are broader than the narrower, categorized disabilities recognized by IDEA "and thus, some students covered by Section 504 are not covered under the IDEA." *Batchelor v. Rose Tree Media School Dist.*, 759 F.3d 266, 269 n.4 (3d Cir. 2014) (*compare* 20 U.S.C. § 1401(3) *with* 42 U.S.C. § 12102(1) (incorporated by reference in 29 U.S.C. § 705(9)(B))).

50.    Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. Sch. Dist. of Phila.*, 559 F. Supp. 2d 600, 620 (E.D. Pa. 2008).

51.    To establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at the school. *Ridgewood*, 172 F.3d at 253.

### G.    Where a school district violates IDEA and Section 504, it also violates the ADA.

52.    The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). As with IDEA and Section 504, the ADA requires districts to offer all students FAPE without a showing of intent or bad faith as any denial of FAPE violates these federal laws. *Id.*

### H.    IDEA and Section 504 have a two-year statute of limitations from when the parent knew or should have known of the violation, i.e. a "discovery rule" limitations period.

53.     The Third Circuit established that IDEA incorporates a traditional statute of limitations that requires a party to file IDEA claims within two years of reasonable discovery of the claims. *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 616 (3d Cir. 2015).

54.     In concluding that the IDEA's statute of limitations applies after discovery of the claims, the *G.L.* court connected the accrual of the statute of limitations to knowledge of the *injury*. *Id.*

55.     A child's right to compensatory education accrues from the time the school district knew or should have known of the injury to the child, and the child is entitled to compensatory education equal to the period of deprivation. *Id*. at 618-19. "That standard is grounded in our understanding, then and now, that 'a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith.'" *G.L.*, 802 F.3d at 619 (*quoting M.C.*, *supra*, 81 F.3d at 397).

56.     A parent's knowledge of academic, emotional, or behavioral struggles at school is not *per se* knowledge that a student is or should be eligible for special education and specially designed instruction, or that the District should evaluate the student. Knowledge of particular facts may not be sufficient to trigger the statute of limitations, such as "where the issue is one that requires specialized expertise a parent cannot be expected to have." *Avila v. Spokane School District 81*, 852 F.3d 936, 944 (9th Cir. 2017).

57.     The district's action and the parent's discovery "can happen on the same day or be spread over months or years." *E.G. v. Great Valley Sch. Dist.*, 2017 WL 2260707 at *8 (E.D. Pa. May 23, 2017). Even the assumption the student is not making progress is not enough to trigger notice. . ." *Id*. at *9 (*quoting Demarcus S. v. District of Columbia*, 190 F. Supp. 3d 35, 45-46)

(D.D.C. 2016)).

58.     To determine whether a claim is timely, federal courts require a "fine-grained analysis as to each claim . . ., including when the parents knew or should have known of the district's alleged deficiency." *Id.* at *1.

    **I.**    **A parent is entitled to attorney's fees and costs if the parent is the prevailing party.**

59.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees and costs by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

**VII.**  **Factual History**

60.     Plaintiffs incorporate by reference the preceding paragraphs.

61.     Peter is diagnosed with Epilepsy, Incomplete Hippocampal Inversion, accommodative vision spasms, and Attention Deficit Hyper Activity Disorder ("ADHD").

62.     Incomplete Hippocampal Inversion is an atypical anatomical pattern of the hippocampus, which is the "memory center" of the brain and also plays a role in emotional regulation.

63.     Medication options are limited for his ADHD due to his Epilepsy.

64.     Peter attended school in the District for most of elementary and middle school.

65.     In third grade (2016-17), Parents requested that the District evaluate Peter.

66.     The District responded, "it makes sense to start with a 504 with the idea that a special education evaluation may be necessary down the road . . . [Peter's] progress will be closely monitored to assist with that decision."

67.     Parents reasonably believed from this statement that the District would contact them if the monitoring showed a need for a special education evaluation.

68.     The District provided Peter with 504 Service Agreements since 2017 which were

largely identical each school year.

69.     Peter received Tier II reading intervention from third grade until the beginning of eighth grade.

70.     Tier II is part of a "Response to Intervention" framework and is a regular education support for students who may need extra academic support. It is not a special education service. *See* https://www.pattan.net/Multi-Tiered-System-of-Support/MULTI-TIERED-SYSTEM-OF-SUPPORTS/Response-to-Intervention-RTI.

71.     During third, fourth, and fifth grade, the District regularly conveyed to Parents that accommodations via a Section 504 Plan and general education interventions were all that Peter required.

72.     Peter's Parents have no training or expertise in education, special education, school psychology, the identification of learning disabilities, or education law or procedure.

73.     They were not advised by any professional during the school years in question as to Peter's educational rights.

74.     In fourth grade (2017-18), the District moved Peter to a different reading class due to ongoing difficulties he was demonstrating in reading.

75.     The District represented to Parents that the change in reading class was all that was needed to address the new concern.

76.     In fact, District records revealed that Peter had been scoring consistently well below benchmark in reading fluency since 2018.

77.     Because Peter has a history of accommodative eye spasms, which can impact his reading, Parents reasonably returned Peter to vision therapy and trusted that the District was making an appropriate recommendation about his reading.

78.     During elementary school, Peter's teachers recommended private reading tutoring for the summers and the District determined that Peter would not be permitted to choose a foreign language due to his academic needs.

79.     The District did not propose any additional evaluation or supports and the District continued to convey that these were typical decisions for students with Tier II reading needs.

80.     The District did not make substantive changes to Peter's 504 Service Agreement between the end of elementary school and the beginning of middle school.

81.     In sixth grade (the 2019-20 school year), teachers regularly reassured Parents in written correspondence that there was no cause for concern and that the beginning of the school year can be difficult.

82.     However, Parents noticed that Peter required an inordinate amount of help with his homework.

83.     On October 10, 2019, Parent requested in writing that Peter be evaluated.

84.     On October 18, 2019, the District issued a Prior Written Notice for the evaluation.

85.     The District evaluated and issued a January 10, 2020, Evaluation Report, finding Peter not eligible for an IEP, but that he required revisions to his Section 504 Service Agreement to address his executive functioning needs.

86.     For the first time, in the January 10, 2020, Evaluation Report, the District reported that Peter asked for a lot of help, relied on his teachers, had difficulty following lessons, lost focus in class, was disorganized, did not understand cues from peers, and needed one-on-one support.

87.     The January 10, 2020, Evaluation Report also revealed, for the first time, that Peter was not meeting reading benchmarks, and that his reading scores were as low as the first (1st) and fifth (5th) percentiles.

88.     The January 10, 2020, Evaluation Report determined that Peter was a student with a disability due to his Epilepsy only, and incorrectly determined that it did not adversely affect his educational performance.

89.     The January 10, 2020, Evaluation Report did not analyze Peter's Incomplete Hippocampal Inversion, an atypical anatomical pattern of the hippocampus, or the memory center of the brain, which plays a role in regulating emotion (a diagnosis that was well-known to the District).

90.     The January 10, 2020, Evaluation Report did not include, *inter alia*, written observation of Peter in the areas of difficulty; reading fluency academic achievement testing despite his history of well below benchmark fluency scores; listening comprehension or spelling academic achievement testing; behavioral or emotional rating scales; a functional behavior assessment; measures of attention/focus; direct assessment of working memory; or any cognitive assessments.

91.     Parents disagreed with the January 10, 2020, Evaluation Report and its accompanying Notice of Recommended Educational Placement ("NOREP"). They returned the NOREP stating that it failed to address the impact of the Incomplete Hippocampal Inversion as well as Peter's failing and near failing grades, and checked the box on the form to indicate that they wanted to pursue mediation.

92.     Parents believed that checking mediation on the form and submitting it to the District would begin the mediation process. They did not understand that they also needed to contact the Office for Dispute Resolution ("ODR") to request mediation.

93.     No one from the District told the Parents that they needed to contact ODR to request mediation.

94.     The District did not revise the 504 Service Agreement after the January 10, 2020,

Evaluation Report to incorporate the recommendations relating to executive functioning.

95.     During sixth grade (the 2019-20 school year), Peter received failing grades for several marking periods across different major academic subjects.

96.     After March 13, 2020, the District closed due to the order of the Governor of Pennsylvania relating to the spread of COVID-19.

97.     Because of his disabilities, Peter struggled with remote learning.

98.     Peter was diagnosed with ADHD before the beginning of the 2020-21 school year.

99.     Parents requested that Peter's Section 504 Service Agreement be updated to reflect and address his ADHD diagnosis before seventh grade (the 2020-21 school year), but the District did not make that update or address the attendant needs.

100.    Upon returning to school for the 2020-21 school year, the District offered hybrid programming, with students receiving instruction both in-person and in remote learning.

101.    The District only offered Peter's 504 Service Agreement accommodations during the in-person learning portion, and offered no support during remote learning.

102.    Before the start of the school year, Parents requested that Peter be permitted to attend for four days per week in person, as some students were permitted, but the District denied the request.

103.    Parents reiterated the request in February 2021 for four days of in-person learning and the District denied it again, although it admitted that students with disabilities pursuant to Section 504 were eligible for such a schedule.

104.    The District did not agree to allow Peter back for four days per week until he was failing all of his core classes in March 17, 2021.

105.    Peter continued to receive failing grades in his seventh-grade year across multiple

core subjects.

106.    On March 4, 2021, Parents requested that Peter be evaluated again.

107.    On March 9, 2021, the District issued its Prior Written Notice for the evaluation.

108.    The District issued a May 6, 2021, Evaluation Report finding that Peter was eligible under Other Health Impairment ("OHI"), that he had reading comprehension and reading fluency needs. The District failed to find that Peter qualified under Specific Learning Disability ("SLD"). Peter scored in the first (1st) percentile for passage comprehension.

109.    The May 6, 2021, Evaluation Report failed to include cognitive assessment, direct assessment of working memory, academic achievement testing in reading fluency or listening comprehension, a Functional Behavior Assessment, student behavior self-rating scales, or observation of Peter during social situations.

110.    The District and Parents attended an IEP meeting on May 17, 2021.

111.    The District initially failed to propose any special education reading support or goals; it only proposed the continuation of Tier II reading.

112.    Eventually, after considerable pleading by the Family, the District conceded and added one goal and 100 minutes per six-day cycle of direct instruction in reading (fewer than 20 minutes per day).

113.    The May 17, 2021, IEP failed to acknowledge behavior as a special consideration. It failed to include a Positive Behavior Support Plan. It included one goal for task completion with no baseline. It omitted the rubric that would be used to measure that goal. It included one goal for reading comprehension and none for reading fluency. It failed to include a baseline for the reading goal. The IEP's reading goal was measured by only one assessment and Peter typically scored in the average range on that assessment. The IEP failed to describe any research-based instruction as

required by IDEA. It failed to include any social skills Specially Designed Instruction or a social skills group. Peter would be in general education 87% of his day.

114.     Parents agreed that Peter is eligible for an IEP, but did not agree that the IEP would meet all of his needs.

115.     On July 12, 2021, Parent inquired about Peter being retained in seventh grade.

116.     On August 10, 2021, because the IEP offered to Peter was not sufficient to meet his needs, Parents sent written notice of their intent to place Peter in a private school and requested District support for the placement.

117.     In Fall 2021, Peter began attending Janus School, a small, private school for students with learning differences, and his grades improved. He was evaluated by Holly Cohen, a school psychologist, who determined that he has a SLD, needs a small school setting, requires a higher level of support than the District offered to address his learning needs, requires social skills group, and was appropriately placed at Janus School.

118.     Ms. Cohen issued an addendum to her report in January 2022.

119.     Peter experienced bullying at the District. Peter was sent harassing emails by peers using school email addresses, some including: "are you gay?"; "bruh ur a loser if u think ur not gay then why does everyone in the school say u are"; "u . . . pussied out when u guys were gonna fight."

120.     A cupcake was smashed into Peter's face in sixth grade and a peer threatened to slit his throat.

121.     In seventh-grade, peers made direct threats of physical violence to Peter on social media, such as a student brandishing a knife and smashing a fire extinguisher saying, "pretend it's Peter."

122.    The 504 team did not meet and no safety plan was created after any incident of bullying/harassment.

123.    In fall 2021, Peter received a message during a school-sponsored event, stating, "Pussy killypurself [sic] where's your gang." Parent emailed the District to report that District students sent this to Peter during the game and to request action from the District. The District never responded to Parent. The District's middle school principal acknowledged that he received Parent's email, did not respond, and that there was no School District investigation.

**VIII.   The Hearing Officer's Errors**

124.    The Plaintiffs incorporate by reference the preceding paragraphs.

125.    Pursuant to the above standards, the District unquestionably failed in its statutory duties to Peter and the Hearing Officer erred in ruling otherwise.

126.    Among other errors, the October 12, 2022, Decision failed to include any findings of fact or analysis related to the Hearing Officer's decision to bar Parents' claims by application of the statute of limitations. Moreover, although the Hearing Officer determined that the District's May 2021 IEP offered to Peter was insufficient to meet his needs, she incongruously determined that the District did not violate Section 504 or the IDEA by failing to offer appropriate special education services before May 2021.

127.    The Hearing Officer's Decision does not include any findings of fact related to when the Parents knew or should have known of the District's violations to trigger the statute of limitations, much less the "fine-grained analysis" that must be conducted. *E.G.*, *supra*, 2017 WL 2260707 at *9.

128.    The Hearing Officer specifically included in the list of issues presented whether any of Parents' claims are barred by the statute of limitations but did not ultimately address the

statute of limitations issue in the Decision.

129.    The Hearing Officer erred in finding that Peter is not owed compensatory education when the District repeatedly offered nearly identical 504 Service Agreements year after year and failed to even update the Service Agreement with the recommendations from the District's own school psychologist or with Peter's new ADHD diagnosis. Not only were the Service Agreements inappropriate, but Peter was also failing all his core classes, not meeting benchmarks in reading, and his teachers were reporting significant in-school struggles.

130.    Similarly, the Hearing Officer erred in finding that Peter did not require an IEP before May 2021. The District's determination in January 2020 that Peter's disabilities were not adversely affecting his performance is belied by the teacher feedback and the assessments included in the January 10, 2020, Evaluation Report. Moreover, Peter was failing his classes and scoring in the first and fifth percentile even after years of Tier II reading intervention.

131.    The Hearing Officer agreed with the Family that the IEP offered to Peter in May 2021 was inappropriate to meet his needs. This was the highest level of services that the District had ever offered and the Hearing Officer found that it lacked the rigor and intensity needed to address Peter's complex needs. Illogically, however, the Hearing Officer did not find that the District had any duty to offer an IEP or a more thorough Section 504 Service Agreement earlier than May 2021 despite ample evidence that the District knew of Peter's struggles and his disabilities.

132.    The Hearing Officer erroneously switched the burden to the Parents to initiate improvements to Peter's programming. In this regard, the Hearing Officer excused the District's lack of action based on Parents' actions such as when Parents did not request mediation through the proper channel, when Parents did not specifically request a 504 team meeting after a deficient 504 Service Agreement was proposed by the District, or when Parents did not provide medical

documentation explaining Peter's Incomplete Hippocampal Inversion (even though the District never requested such documentation). These findings flip the burden to provide a FAPE onto the Family and are contrary to Third Circuit precedent. The record is clear that Parents actively participated and sought increased supports from the District and were regularly denied the same.

133.    The Hearing Officer accepted that Peter has a Specific Learning Disability, but erroneously found that the District's evaluations—which failed to identify Peter with same—were somehow sufficiently comprehensive.

134.    The Hearing Officer erred when she found that the District did not discriminate against Peter and the District's lack of action to address Peter's social skills needs and the bullying he endured did not deny him a FAPE or deny him educational benefits.

135.    Although Parents maintain that the District should be responsible to reimburse them for Peter's private school tuition for the 2021-22 school year because the District failed to offer a FAPE, Parents focus this appeal on the issues that stem from the District's denial of FAPE while Peter attended school in the District.

136.    The evidence established that the District violated the ADA for the same reasons that it has violated the IDEA and Section 504, all of which excluded Peter from participation in and denied Peter the benefits of the services, programs, or activities of a public entity and subjected him to discrimination. The Hearing Officer erred by failing to conclude that the District violated IDEA and 504.

**WHEREFORE**, the Plaintiffs respectfully requests that this Court:

1.    Assume jurisdiction over this action;

2.    Hear additional evidence as requested by a party pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.      Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA, and Pennsylvania law;

4.      Award the Family compensatory education for the District's violations;

5.      Reverse the Hearing Officer's finding that the statute of limitations bars claims before January 10, 2020 and hear limited evidence to the District's denial of FAPE prior to January 10, 2020;

6.      Order the Defendant to pay Plaintiffs' reasonable attorneys' fees and related costs as the prevailing party below; and

7.      Grant such other relief as this Court deems proper.

Respectfully submitted,


Dennis C. McAndrews, Esquire
PA ID No. 28012


Michael J. Connolly, Esquire
PA ID No. 82065


Jacqueline C. Lembeck, Esquire
PA ID No. 314535


McANDREWS,     MEHALICK,     CONNOLLY,
HULSE and RYAN, P.C.
30 Cassatt Avenue
Berwyn, Pennsylvania 19312
Tele: 610-648-9300
Attorneys for Plaintiffs